# In the United States Court of Federal Claims

No. 21-1629 C
Filed Under Seal: March 10, 2022
Reissued: March 29, 2022[*]

```
* * * * * * * * * * * * * * * *   *
                                  *
B.H. AIRCRAFT COMPANY INC.,       *
                                  *
            Plaintiff,            *
                                  *
      v.                          *
                                  *
THE UNITED STATES,                *
                                  *
            Defendant,            *
                                  *
and                               *
                                  *
GENERAL ELECTRIC COMPANY,         *
d/b/a GE EDISON WORKS,            *
                                  *
            Defendant-Intervenor. *
                                  *
  * * * * * * * * * * * * * * * * *
```

*Abraham Gdanski*, argued the motions *pro hac vice*, *Sam Z. Gdanski*, counsel of record, Gdanski Law PC, of Teaneck, NJ, for Plaintiff.

*Daniel B. Volk*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Douglas K. Mickle*, Assistant Director, *Martin F. Hockey, Jr.*, Acting Director, and *Brian M. Boynton*, Acting Assistant Attorney General, all of Washington, D.C., for Defendant, and *Karen E. Anderson*, Assistant Counsel, NAVSUP Weapon Systems Support, of Philadelphia, PA, of counsel.

*Richard P. Rector*, with whom was *Thomas E. Daley*, DLA Piper LLP, all of Washington, D.C., for Defendant-Intervenor.

---

[*]   Pursuant to the protective order entered in this case, this opinion was filed initially under seal.  The parties provided proposed redactions of confidential or proprietary information.

## OPINION AND ORDER

**SOMERS,** Judge.

On July 29, 2021, Plaintiff B.H. Aircraft Company Inc., ("B.H.") filed a pre-award bid protest in this Court challenging "the inclusion of spare part replacement services for a single part"—aircraft engine afterburner liners—within a larger sole source solicitation announced by the United States Department of the Navy ("Navy"). ECF No. 1 at ¶ 4 ("Compl."). Plaintiff, "a small business, specializing in providing complex fabrications for aerospace and ground power applications," *id.* ¶ 1, alleges that the solicitation improperly "bundles spare part replacement services within a planned procurement covering varying support services for multiple parts" relating to the F414 engine that is used to power the F/A-18 E and F Super Hornet and the EA-18G Growler model aircraft, *id.* ¶ 4; *see also* ECF No. 29 at 1 ("Gov.'s MTD & MJAR").

The solicitation covers 778 components, "some repairable, others consumable," used in the F414 engine. Gov.'s MTD & MJAR at 2. Defendant-Intervenor General Electric Company d/b/a GE Edison Works ("Defendant-Intervenor" or "GE") is the original equipment manufacturer ("OEM") for the F414 engine and, since 2005, has contracted with the Navy "as the only responsible source, to fulfill its requirements for F414 engine support." *Id.* For relief, Plaintiff requests the Court find "that the bundling was improper and order the unbundling of the procurement," or alternatively "to exclude repair/replacement services for [the relevant afterburner liner] which should have been excluded from the Protested Solicitation." Compl. at 23.

The government and Defendant-Intervenor move to dismiss Plaintiff's complaint for lack of standing or, in the alternative, for judgment on the administrative record. In addition, Defendant-Intervenor moves to dismiss Plaintiff's complaint for failure to state a claim upon which relief can be granted. For the following reasons, the Court dismisses Plaintiff's complaint because Plaintiff has failed to establish that it has standing to bring the instant protest and, in the alternative, for failure to state a claim upon which relief can be granted.

## BACKGROUND AND PROCEDURAL HISTORY

### A.   The F414 Fleet Support Performance Based Logistics Requirement—History, Purpose, and Context

This protest challenges the Navy's procurement of a Fleet Support ("FS") Performance Based Logistics ("PBL") contract to support its fleet of F414 aircraft engines, specifically "the 778 General Electric F414 engine components," which "includes 35 7R Families of repairable [National Item Identification Numbers ("NIINs")] (72 in total) and 706 1R consumable NIINs." AR 41. The dispute concerns the inclusion of one aspect of the line item in the solicitation for the repair, overhaul, and replacement of one particular component out of the 778 in the anticipated contract: NIIN 014808247, or part number ("PN") 5103T24G04, which is an afterburner liner for the subject engines. AR 199.

2

Issued by the Naval Supply Systems Command, Weapon Systems Support ("NAVSUP WSS"), the F414 PBL contract is for a period of five years, with an expected period of performance starting May 1, 2022, and concluding April 30, 2027.  AR 41.  According to the Navy, "[t]he repair and replacement of F414 engine controls and accessories, and engine afterburner module components are elements of the Navy's Maintenance Strategy for the F414 engine," and "[a] continuous supply of Ready for Issue (RFI) F414 engines is required in support of flight operations for F/A-18 E, F and EA-18G model aircraft" used by the Navy.  AR 62.  The awardee of the contract "shall be required to *repair or replace* the 72 repairable components and supplying or manufacturing the parts needed for those repairs," and "shall also be responsible for supplying or manufacturing the 706 consumable components."  AR 41 (emphasis added).  Moreover, the awardee "shall also be required to partner with the Fleet Readiness Center Southeast (FRCSE), Jacksonville, FL for repair touch labor."  *Id*.

The contract does not represent an entirely new PBL requirement.  AR 55.  Rather, it "is a follow-on effort that will replace NAVSUP WSS' current PBL support contract for F414 engine Fleet Maintainer support, the three-year F414 FS PBL contract, N00383-18-D-P601, which expires on 30 April 2022."  AR 95.  "Since fiscal year 2005, the Navy has contracted with [Defendant-Intervenor] . . . to fulfill its requirements for F414 engine support."  Gov.'s MTD & MJAR at 2; *see also* ECF No. 33 at 13 ("Pl.'s Resp. & Reply") ("Prior to the Issuance [sic] of the first F414 PBL, solicitations for the afterburner liner of issue were issued as smaller, stand-alone requirements for spares suitable for award to an approved small business (Ref N0038303QM466 Dated Oct 2003).").

In fact, the instant procurement constitutes the sixth iteration (or, fifth renewal) of an FS PBL contract for the F414 engine.[1]  The record indicates that for each consecutive iteration, Defendant-Intervenor was the sole source awardee.  *See generally* AR Tabs 29, 32, 34–36; *see also* AR 1410 (Navy's 2003 F414 PBL contract Justification and Approval memorandum finding that "[o]nly [Defendant-Intervenor] will be solicited because the articles to be repaired/replaced are highly specialized parts designed by a non-Government entity and the technical data required for repair or replacement of repairable components by other than [Defendant-Intervenor] is not adequate to support full and open competition.").

On December 3, 2020, following a government-only "F414 Fleet Support PBL 5th Renewal Kick-Off" meeting in September 2020, *see generally* AR Tab 1, NAVSUP WSS issued a synopsis outlining the contours of the anticipated renewal contract.  *See generally* AR Tab 2.  Per the synopsis, "[p]rospective offerors must submit a source approval request to NAVSUP WSS to become an approved Navy source of supply."  AR 41.  It further states that the "requirement will be procured in accordance with [Federal Acquisition Regulation ("FAR")] 6.302-1, only one responsible source and no other supplies or services will satisfy agency requirements."  *Id*.; *see also* AR 17 (renewal meeting notes providing that "Acquisition Strategy will remain a Sole source PBL to the OEM: GE Aviation.") (emphasis omitted).  Responses to

---

[1] *See* AR Tab 36 (F414 FS PBL N00383-08-D-002M (2/1/2008 to 6/30/2011)) ("2008 PBL"); AR Tab 35 (F414 FS PBL N00383-11-D-002M (7/1/2011 to 12/30/2014)) ("2011 PBL"); AR Tab 34 (F414 FS PBL N00383-15-D-001M and P00001 (12/31/2014 to 1/11/2018)) ("2014 PBL"); AR Tab 32 (F414 FS PBL N00383-18-D-N901 (1/12/2018 to 7/31/2018)) ("2018 PBL"); AR Tab 29 (F414 FS PBL N00383-18-D-P601 (8/1/2018 to 4/30/2022)) ("Incumbent PBL").

the notice were due December 18, 2020, and, according to the contracting officer's "Small Business Coordination Record," the deadline passed with "no other source [having] expressed an interest in the subject requirement." AR 54.  The same document goes on to state that "[t]he Government intends to contract on a sole source basis with General Electric (GE)," which "is the owner of the technical data required to perform the contract.  No other public or private entity has the requisite technical data to meet the requirements of the contract."  AR 54.

As part of this procurement, the Navy produced a "Determination and Findings for Authority to Consolidate Contract Requirements" ("D&F"), given that "[a]n additional 2 consumable and 1 repairable components will be added to this contract."[2]  AR 116.  Because the additional components are either not previously contracted for or are currently supported under a separate contract, the D&F concludes that "the proposed acquisition constitutes a consolidation as defined in FAR 2.101."  *Id.*  However, as the existing separate contract was already with Defendant-Intervenor, "[t]his proposed contract *does not constitute bundling* as no small businesses have performed contracts for any of the items covered by this acquisition."  *Id.* (emphasis added).

The D&F also outlines the results of the Navy's market research, which "indicated that there are no other sources which expressed interest in repairing the required components, currently attempting to become a qualified manufacturing source, or capable of delivering the required performance covered by this acquisition."  AR 117; *see also id.* ("[Defendant-Intervenor is] the sole designer and developer of the F414 engine and has been solely responsible for the engine requirements since development of the engine for the F/A-18E/F aircraft in 1997 . . . . Currently no other entity is capable of providing the level of support, operational availability, and reliability improvements desired in this contract.").

Per the Navy's acquisition plan for the instant procurement, "[t]he Navy's current budgeted inventory of F414 engines is ▇▇▇ with projected increases to ▇▇▇ engines by fiscal year 2025."  AR 107.  Moreover, "[a]ll parts required in support of depot level remanufacture, all replacement afterburner module piece parts, and all module reassembly and accessory attaching hardware support, as required, will be provided by the Contractor," and "[i]n order to be successful, the Contractor must fill all Navy requisitions for these requirements with delivery in two (2) to sixty (60) days depending upon requisition priority."  *Id.*

Additionally:

Full and open competition is not contemplated for this proposed procurement. This procurement is based upon the authority of 10 USC 2304(c)(1), as implemented by Federal Acquisition Regulation 6.302-1, only one responsible source.  General Electric is the OEM and is the only company capable of delivering an F414 component support solution that entails remanufacture, replacement, or reengineering in response to current and future failure modes. GE is the only entity possessing the requisite system engineering capability and production capacity to remanufacture or replace F414 engine components while

---

[2] The record demonstrates that the additional reparable item added for this PBL is PN 6057T80G02, *see* AR 67, which is identified as a "SYNCHRONIZING RING, AUGMENTOR EXHAUST NOZ," *see* AR 199.

meeting all elements of form, fit and function, required to keep the complex F/A-18 propulsion and power system operational, reliable and durable.

AR 108.  Furthermore, with regard to potential alternative sources:

> A review was conducted on the 778 line items comprising this F414 FS PBL repair/replacement requirement to identify all potential suppliers.  The F/A-18 Program Office and NAVSUP WSS Aviation Engine Integrated Weapons System Team (IWST) reviewed the capabilities necessary to perform the F414 FS PBL and have concluded that two or more sources are not available to provide independently priced proposals *in response to this 778 line item PBL requirement* because of the limited capability and capacity within the private industrial base related to augmented turbine engine *maintenance*.

AR 111 (emphasis added); *see also* AR 119 (Navy's J&A describing requirement as a contract "to support F414 aviation engine *maintenance*") (emphasis added).

> The Navy also prepared a "Justification and Approval for Use of Other Than Full and Open Competition" memorandum ("J&A"), outlining the reasons why the requirement will not be competitively sourced, which provides:

> GE is the owner of the technical data required to perform the contract.  No other public or private entity has the requisite technical data to meet the requirements of the contract.  In response to NAVSUP WSS' request for a current price for an F414 PBL reprocurement data package, GE responded on 3 December 2020, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  For this reason, the option of pursuing competition for this requirement is not available.

> GE, as designer and in-production manufacturer of the F414 propulsion and power system, is also *the sole company who currently possesses the equipment and capability to deliver the F414 life cycle maintenance and support* required by the Navy. . . .  GE is the only company capable of delivering an F414 component support solution that entails *remanufacture, replacement, or reengineering* in response to current and future failure modes.  GE is the only entity possessing the requisite system engineering capability and production capacity to remanufacture or replace F414 engine components while meeting all elements of form, fit and function, required to keep the complex F/A-18 propulsion and power system operational, reliable and durable.

AR 120 (emphasis added).  Accordingly, the contracting officer "determined that given GE's unique capability, the private industrial marketplace does not support adequate competition as defined at FAR 15.4 for this PBL requirement." *Id.*

## B.    B.H. Requests "Exclusion" of Afterburner Liner from Forthcoming F414 FS PBL

On January 26, 2021—more than a month after the deadline to respond to the Navy's synopsis—Daniel Kearns, President of B.H., emailed the contracting officer, enclosing a letter, "to request consideration of the exclusion of one item from this planned bundling action to protect competition, small business interests and projected cost savings to the US Navy and DoD." AR 100.  The letter states that Plaintiff "has been doing business with the [Navy] both directly and through the [Defense Logistics Agency] Philadelphia office for over 50 years," and that "our company has been your source for Afterburner Liner and associated hot section products for the F404 engine family." *Id.*

The letter continues that "[w]hile we have not yet delivered production articles, our company is also approved for the Afterburner Liner for the F414, P/N 5103T24G04 (NSN 2840-01-480-8247),"[3] for which B.H. "[is] the sole approved source other than the OEM" and is "in the process of completing tooling and processes in support of this item . . . ." AR 101.  Accordingly, B.H. "respectfully request[s] exclusion of this part from the planned list to preserve competition and achieve cost savings to the [government]." *Id.*

## C.    Solicitation Issued

On March 31, 2021, the Navy formally issued solicitation number N00383-21-R-003C.[4] *See generally* AR Tab 9.  The solicitation identifies itself as "a Requirements contract for the supplies *and services* specified . . . ." AR 127 (emphasis added).  Per the solicitation's statement of work ("SOW"),

> [t]he PBL support requires the Contractor to meet system demand requirements, manage reliability, improve availability, and manage obsolescence while reducing the total life cycle costs of the F414 engine.  More specifically it provides for: (a) availability of engine components (including inlet devices), and spare parts (and including EZ line material to support buildup of engine/modules at the Depot); and, (b) the development and operation of an F414 component management system to provide logistics support at the Depot (D), Intermediate Level 3 (I3) and Organizational (O) maintenance level.

AR 134.

The afterburner liner that Plaintiff requested be excluded/separately sourced and competed, PN 5103T24G04, remained in the list of F414 items covered under the PBL solicitation.  AR 199 (Item 3).  Furthermore, "engine components" in the contract, like PN

---

[3] An attachment to the presolicitation notice shows a "list of items" that suggests not just one but three versions of F414 afterburner liners.  *See* AR 43 (showing three separate part numbers for "LINE,AFTERBURNER,T" as items 3, 4, and 5).  Plaintiff's letter to the CO requests the "exclusion" from the procurement of PN 5103T24G04, apparently leaving liners/part numbers 5103T24G02 and 5103T24G03 for Defendant-Intervenor.  AR 43.

[4] The announcement also identifies the "Requisition/Purchase" as N00383-21-Y-4876.

5103T24G04, "are identified with a '7R' COG code in the Contract Schedule.  The Contractor shall be responsible for the *repair/overhaul/replacement* of these components in accordance with the applicable provisions of this contract."  AR 134 (emphasis added); *see also* AR 41 (explaining that the component list "includes 35 7R Families of repairable NIINs (72 in total) and 706 1R consumable NIINs.").

The contractor "will procure parts or services, including unique consumable items to support this requirement in accordance with the Contractor's standard supplier, purchasing and quality systems.  The Contractor will not be required to purchase or use any parts or services that do not satisfy the requirements herein."  AR 135.  Critically, "*[t]he Contractor* shall perform Depot level *repairs and/or overhaul, or replacement* of the components covered by this agreement . . . .  *The Contractor shall make the sole determination* of repair or replacement decisions."  AR 136 (emphasis added).[5]  As such, the contractor is not compensated based on how many spare components it manufactures versus repairs performed.  *See, e.g.*, AR 138 (noting that at the end of the contract, the contractor "may retain title to all consumable parts (1R) stocked in excess of the Attachment F quantities").  Rather, payment is based on "[t]he contractor [furnishing] *effort* including labor, material, and facilities as may be required to repair and/or modify or replace the spares and repairables assemblies set forth in Attachment 'A' in order to meet the Supply Response Time (SRT) metric described within the SOW outlined in Section C," and "[d]elivery orders will specify the invoice amounts for given *performance periods*," not quantities of components provided.  AR 131 (emphasis added).[6]

The solicitation does not provide for a phase-in period.  Rather, "*starting immediately upon contract award*, the Contractor will assume responsibility for fleet requisition processing and shall be subject to the [Supply Response Time] performance requirements" of the contract.  AR 136 (emphasis added).  The contractor "is responsible for all necessary infrastructure," and "shall manage the program to provide material availability as defined herein."  *Id*.  "This includes but is not limited to managing and augmenting asset pools necessary to meet the SRT performance metric while addressing attrition, wear out, scrap, system carcass loss and obsolescence."  *Id*.  Speed and reliability appear key, as the solicitation's SRT metric "requires the Contractor to satisfy 100% of the requisitions within specified timeframes," AR 139, including certain requisitions that must "be filled in 2 Days 80% of the time, or 30 days for the remainder" and others "in 10 days at least 80% of the time, and the remainder in 60 days," AR 140.

---

[5] The solicitation distinguishes "Engine Components (7R)" from "Spare Parts (1R)," for which "[t]he Contractor shall be responsible for providing these spare parts in support of the Government's Intermediate, Organizational, and Depot level maintenance requirements . . . ."  AR 134.

[6] The components "covered by this PBL are subject to demand bands either individually, or aggregated with other PBL components into buckets."  AR 143.  If actual demands fall within a stated demand band, there is no adjustment to the contract price—in other words, no additional payment to the contractor nor discount to the government.  *Id*.  However, "[w]hen the number of actual received requisitions (demands) for the period is GREATER THAN the Demand Band Upper Limit, the Contractor is eligible for a variable price adjustment (contract funding increase) to the total contract price for the [Period of Performance] associated with a Demand Band Reconciliation for that given bucket or item if assessed individually."  AR 144 (emphasis in original).  In the same way, if demand falls below the lower limit of a given demand band, the government is eligible for a contract funding *decrease* for the relevant Period of Performance.  *Id*.

7

**D.      Navy's Response to Plaintiff's "Exclusion" Request**

On April 28, 2021, following Plaintiff's request of January 26, 2021, to exclude the afterburner liner from the solicitation—and following the formal issuance of the solicitation on March 31, 2021—the contracting officer replied to Plaintiff, in relevant part:

> NAVSUP WSS has reviewed your request and has determined that the exclusion of the requested item is not warranted.
>
> As noted in the synopsis, all "Prospective offerors must submit a source approval request to NAVSUP WSS to become an approved Navy source of supply." NAVSUP WSS reviewed the database of record, and as of this writing, B.H. Aircraft is not listed as having been approved by the Navy as a source for the repair or manufacture of the item in question (NSN 2840 01-480-8247).
>
> Furthermore, NAVSUP WSS has reviewed the synopsized and solicited market basket and does not concur with B.H. Company's contract bundling assertion. NSN 2840-01-480-8247 is currently being supported under contract N00383-18-D-P601, and has been determined to be sole sourced to the Original Equipment Manufacturer.
>
> Additionally, the item in question has been supported by NAVSUP WSS not only under the current Performance Based Logistics (PBL) contract that is currently being synopsized and solicited, but also under all previous iterations of this PBL. As an item within the PBL market basket, full support of the requested item as well as all others, requires the contractor to not only provide newly manufactured items, if needed, but repairs, repair piece part support, warehousing, coordination with the Navy's FRC South East and number of other PBL support related responsibilities. Because of this, capability of manufacturing only a few of these parts is insufficient to meet the Navy's solicited requirement.  Because of the ongoing Navy need, the synopsis states ". . . if evaluation of a source approval request submitted hereunder cannot be processed in time and/ or approval requirements preclude the ability to obtain subject items in time to meet Government requirements, award of this requirement may be continued based on fleet support needs."

AR 281.  The next day, Plaintiff responded, in relevant part:

> Respectfully, in our review of this correspondence, it appears that the source approval history on the subject item is not consistent with the database referenced. . . . .
>
> [The contracting officer's letter] states in part that "NAVSUP WSS reviewed the database of record, and as of this writing, B.H. Aircraft is not listed as having been approved by the Navy as a source for the repair or manufacture of the item in question (NSN 2840-01-480-8247)".  B.H. Aircraft was informed via

Attachment (1) that it was added as an approved alternate source for the subject item in December of 2004.  In addition, B.H. Aircraft was directly solicited by the Navy for a requirement for NSN 2840-01-480-8247 in June of 2019 which, consistent with Attachment (1), lists our CAGE (85291) as a source within the CLIN description (See Page 2 of Attachment (2)).  Furthermore, our company responded to Attachment (2) and was awarded the Attachment (3) contract for this item by [Defense Logistics Agency] Aviation At Philadelphia on 18 July 2019. We are presently in the hardware manufacturing phase for the First Article under this contract. . . .

By definition, both the existing PBL and the planned PBL are "Substantial bundling" actions and we maintain that the inclusion of this item in a new bundled contract will greatly impact our company as it would foreclose our access to future replacement business for an item that we are approved for and which we are depending on to offset declining demand for the same products on legacy platforms presently being manufactured for USN end use.

We further maintain that the inclusion of new hardware requirements for this part will result in substantially higher costs to the Government than would otherwise result with the preservation/establishment of competition. . . .

As our company is an approved supplier for the item identified and we are in product manufacture under an existing contract, comments relating to time for approval requirements should not apply.  Rather, as the planned action is for requirements beginning April 2022 and we are building product in 2021, our company is well positioned to meet ongoing new hardware demand for this part if access to requirements is preserved.

AR 283–84.  Attached was a December 13, 2004, letter to Plaintiff from the Naval Inventory Control Point ("NAVICP"), determining that "B.H. Aircraft Co, Inc is qualified to *manufacture* the F-414 Liner based on strong similarity" to the F-404 afterburner liner.[7]  AR 285 (emphasis added).

Plaintiff asserts that certain internal Navy emails in the administrative record, which were exchanged between Plaintiff's initial outreach and the Navy's written response to Plaintiff, are a "telling indication of [the Navy's] error and unawareness" of Plaintiff's status as an approved manufacturer for the F414 afterburner liner.  Compl. ¶ 46; *see also* ECF No. 26 at 10 ("Pl.'s MJAR") ("Upon receipt of the Administrative Record, it became clear that [sic] was once only an assumption – that the Navy's actions were due to internal error and unawareness – became certainty and strikingly well documented."); Pl.'s MJAR at 11 ("After BH sent its January 25th letter, the Navy went into a frenzy as to why BH approval was not picked up.").  For example, Plaintiff quotes an email from the contracting officer to a Small Business Technical Advisor with NAVSUP WSS, which states:

---

[7] The approval letter concerns "Part Number (99207) 5103T24G04."  AR 285.

Please see the attached [April 29, 2021] letter from BH Aircraft. They've referenced and attached a 2004 source approval letter for an F414 FS PBL item. The item has been on the FS PBL for many iterations (maybe since its inception but I'm not positive). We've asserted to BH that they are not an approved sources for the US Navy, is this inaccurate? Does their referenced letter mean they should have been added to our system of record or would they have to have completed additional tasks to become listed as such?

Compl. ¶ 47; *see also* AR 1604. In response, the Small Business Technical Advisor emailed:

Please interrogate the ITIMP system under potential sources and notes to the buyer. BH Aircraft a small business is indeed an approved source of supply and is listed as such. The JDRS also indicates this. This approval is for the manufacture of the subject item. BH has a long history with the F404 AB liner and the 414 is basically made from the same layout as the F404. Both utilize GEAE Specification B50TF50 Thermal barrier coating.

Compl. ¶ 48; *see also* AR 1603.[8]

Plaintiff cites for support various other email discussions among Navy personnel, including an April 1, 2021, email from a NAVSUP WSS Competition Advocate, commenting that "[w]e recognize sourcing decisions on PBL procurements are solely the purview of the PCO as supported by whatever business case analysis is performed," but "[i]f asked in such a case as this, we would support the detachment of the competitive items from the PBL in the interests of maximizing competition and its benefits (i.e. lower pricing, shorter leadtimes, expanded industrial base, etc.)." Pl.'s MJAR at 13; *see also* AR 1583. That same day, however, the contracting officer had emailed colleagues that "legal concurs this [PBL] does not constitute bundling," and "[t]he item in question has been supported continuously through this PBL since WSS began managing the item." AR 1578; *see also* ECF No. 34 at 7 ("Gov.'s Resp. & Reply") ("BH's continued discussion of how it is an 'approved source' for manufacture is irrelevant, given that BH mounts no meaningful challenge to the reasons that the Navy does not have a stand-alone need to purchase spare afterburner liners.").[9]

---

[8] The administrative record includes a draft Navy response to Plaintiff's April 29, 2021, letter. *See* AR 1648–49. Therein, the Navy "acknowledges [the] initial oversight of B.H. Aircraft's approval as a manufacture source," but states that "B.H. remains unapproved as a repair source for the [component] in question." AR 1648. The draft further provides that "[t]he synopsized and solicited requirement is for PBL support," and "[t]he PBL support strategy is *at its core a repair contract* along with a number of supply chain management functions." *Id.* (emphasis added).

[9] The Court notes the heavy reliance in its motion for judgment on the administrative record that Plaintiff places on this set of internal Navy emails. In fact, the *only* portions of the administrative record Plaintiff cites or draws upon in its motion—barring a passing reference to AR 855, which shows Defendant-Intervenor's pricing—are these internal agency emails. Essentially, Plaintiff's *entire motion* for judgment on the administrative record, therefore, rests on the dialogue of Navy personnel via email, wherein Plaintiff claims the agency's alleged error is made evident. For reasons explained below, these emails are almost entirely irrelevant to Plaintiff's claims, which relate to bundling. Moreover, Plaintiff fails to point to a single portion of the administrative record—or, fails to move to supplement the record with evidence—suggesting a separate smaller contract that was allegedly bundled into the instant PBL. In essence, Plaintiff is alleging that a contract is being improperly bundled while only citing and drawing upon internal emails that solely relate to Plaintiff's status as an approved source of manufacture. Rule

### E.     Plaintiff's Protest at the Government Accountability Office

On May 10, 2021, following the Navy's written response of April 28, 2021, Plaintiff filed a bid protest at the Government Accountability Office ("GAO"), *see generally* AR Tab 13, emphasizing that "BH has been the Navy's source for Afterburner Liner and associated hot section products for the F404 engine family," and has been approved since 2004 to manufacture the relevant F414 afterburner liner, AR 294.  Plaintiff asserted that "[h]ad the government excluded the After Burner Liner from the solicitation, BH would be able to provide the item at the lowest cost."  AR 298.  It further alleged that the Navy "violated both [the Competition in Contracting Act] restricting competition and the Small Business Act protecting small businesses by their proposed actions."  *Id*.  Accordingly, Plaintiff requested "that the [subject afterburner liner] be excluded from the solicitation."  AR 299.

In response, on May 21, 2021, the Navy informed GAO that it "intends to procure this requirement pursuant to FAR 6.302-1 as there is only one known responsible source that can fulfill the *complete requirement* described in solicitation N0038321R003C."  AR 382 (emphasis added).  On May 25, 2021, the Navy requested that GAO dismiss the protest "pursuant to 4 C.F.R. §21.0(a) because B.H. Aircraft is not an interested party to challenge the procurement." AR 543.  The Navy acknowledge that NAVSUP WSS "conditionally approved the protestor for the **manufacture** of the F414 AB Liner" in 2004, but it stressed that such approval "[did] not confer any approval for the **repair** of the F414 AB Liner," thus—given all the requirements of the instant solicitation—Plaintiff is "not an interested party to challenge the solicitation because it is not eligible for award."  *Id*. (emphasis in original).

On June 21, 2021, GAO dismissed Plaintiff's protest, concluding that Plaintiff had "not demonstrated that it qualifies as an interested party under the circumstances presented here," because, *inter alia*, "the protester provided a copy of a letter from the agency dated from 2004, which states—consistent with the agency's explanation—that BH Aircraft's source approval request was for '*manufactur[ing]*,' *not repairing*, the F-414 afterburner liner . . . ."  AR 691 (emphasis added).

### F.     The Instant Protest

On July 29, 2021, Plaintiff filed the instant action, arguing similar grounds as were raised (and dismissed) at GAO.  *See generally* Compl; Pl.'s MJAR.  Plaintiff asserts five causes of action: first, "[t]he Navy failed to comply with FAR 7.107 Additional Requirements For Acquisitions Involving Bundling"; second, "[t]he implicit assumption that part costs will be identical regardless of whether the Navy purchases parts competitively or via a sole source contract was unsupported and illogical"; third, "[t]he bundling violated FAR 7.07(e) by failing to, '(3) Specify actions designed to maximize small business participation as contractors,

---

52.1 of the Rules of the United States Court of Federal Claims ("RCFC") provides that "a party may move for partial or other judgment on the administrative record and must include in its motion or supporting memorandum a statement of facts that draws upon and cites to the portions of the administrative record *that bear on the issues presented to the court*."  RCFC 52.1(a) (emphasis added).  Yet, it seems Plaintiff relies on nothing in the administrative record that "bear[s] on the issue[]" of whether the PBL was bundled to begin with.

including provisions that encourage small business teaming; (4) Specify actions designed to maximize small business participation as subcontractors (including suppliers) at any tier under the contract, or order, that may be awarded to meet the requirement . . .'"; fourth, "[t]he actions of the Navy evidence bias toward GEAE"; and fifth, "[t]he Navy failed to conduct updated relevant market research as required by the FAR."  Compl. at 22–23.[10]

In sum, Plaintiff alleges the instant procurement is a bundled contract, that the Navy erred in failing to recognize Plaintiff as an approved alternate source of supply for the subject afterburner liner, and, in failing to so recognize, the Navy erred by failing to conduct requisite market research and price analysis pursuant to the FAR before bundling the afterburner liner into a sole source PBL contract.

In support of its allegations—particularly its ability to compete—Plaintiff draws special attention to a contract awarded to it by the Defense Logistics Agency ("DLA") in July 2019 ("DLA contract") to manufacture four spares of the subject F414 afterburner liner for a Foreign Military Sales ("FMS") order.  *See* AR Tab 40; *see also* Pl.'s Resp. & Reply at 2 ("The Agency and GE also do not offer any response to the fact that BH is both source approved for the subject afterburner liner . . . *and has been awarded a contract* . . . for its production.") (emphasis added).  All deliveries under the DLA contract were originally to be completed by the end of November 2020.  AR 1477–78.[11]  It is undisputed, however, that to date—over two-and-a-half years following contract award and well over a year since these four spares were originally to be delivered—Plaintiff has either not provided a single delivery pursuant to this contract, or at least has not updated the record before the Court to indicate that it has done so.  *See, e.g.*, AR 1549 (describing in a December 9, 2020, DLA email to Kearns the first "Subclin" in Plaintiff's contract as "delinquent"); AR 1556 (describing in a June 30, 2021, DLA internal email Plaintiff's contract as "delinquent"); AR 1558 (describing in an August 10, 2021, DLA email to Kearns Plaintiff's contract as "delinquent"); *see also* Pl.'s Resp. & Reply at 3 (asserting that Plaintiff "has not been issued any Cure Notice, Show Cause, but in fact things are progressing smoothly.  Further this is not relevant as the Agency simply missed the fact BH was and is an approved source.").

In response, the government and Defendant-Intervenor move the Court to dismiss Plaintiff's complaint and, in the alternative, for judgment on the administrative record.  Both parties move for dismissal pursuant to Rule 12(b)(1) of the Rules of the United States Court of

---

[10] While normal citation conventions for paragraphs in a complaint would counsel citing the relevant paragraphs by number, inexplicably the relevant paragraphs are not in numerical order.  Plaintiff's first through third causes of action appear correctly numbered as paragraphs 114, 115, and 116 respectively.  Yet, the immediately following fourth cause of action is numbered as paragraph "88," and the paragraph thereafter is numbered "191."  Given this confusing numeration, the Court cites only to the relevant pages within Plaintiff's complaint.

[11] The administrative record reflects multiple Plaintiff-requested modifications for delivery extensions in the DLA contract, for which Plaintiff offered reductions in the total contract value.  *See, e.g.*, AR 1555 ("As consideration for this request and your FMS customer, we are offering a $ 5,000.00 reduction in the total contract value.").  The most recent email from DLA to Plaintiff suggests that CLIN 0001AB, which has a modified contract due date of June 25, 2021, remains "delinquent."  AR 1558.  The record reflects no response from Plaintiff.  Plaintiff, nevertheless, insists it is still performing.  *See* Pl.'s Resp. & Reply at 6–7 ("BH is performing pursuant to the contract. . . . BH is in continued discussions with DCMA and as recently as of November 4, 2021 had been in communications with them.") (citing "Exhibit A to Kearns Aff.").

Federal Claims ("RCFC"), while Defendant-Intervenor also moves for dismissal pursuant to RCFC 12(b)(6). *See generally* Gov.'s MTD & MJAR; ECF No. 28 ("GE's MTD & MJAR").

First, as to RCFC 12(b)(1), both parties assert that Plaintiff lacks standing to challenge the instant procurement because, even if the subject F414 afterburner liner was "excluded" and competed as a separate procurement, Plaintiff has not sufficiently established that it can manufacture the F414 afterburner liner. *See* GE's MTD & MJAR at 13 ("Although BH's complaint alleges that BH has been 'approved' for manufacturing F414 afterburner liners since 2004, BH's complaint does not state that it has successfully manufactured a single liner in those seventeen years. . . . Additionally, [Plaintiff] fails to demonstrate that it is capable of meeting the Navy's required supply response times . . . ."); Gov.'s MTD & MJAR at 12 ("BH asks this Court to require the Navy to compete a requirement for manufacturing of afterburner liner spares independently, but BH fails to demonstrate that it is capable of actually delivering that product.").

Second, Defendant-Intervenor contends, pursuant to RCFC 12(b)(6), that Plaintiff fails to state a claim, because its "complaint only addresses regulations pertaining to bundling, and the PBL contract at issue is, by definition, not a bundled requirement," and thus Plaintiff's cited FAR regulations—and any requisite analyses that would follow—"do not apply to the procurement at issue." GE's MTD & MJAR at 13.

On January 13, 2022, the Court held oral argument on the pending motions, and the matter is now ripe for consideration.

## DISCUSSION

### A.    Legal Standard

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ." 28 U.S.C. § 1491(b)(1). In such actions, the Court "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4). Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Under such review, "'[a] bid award may be set aside' if (1) 'the procurement official's decision lacked a rational basis' or (2) 'the procurement procedure involved a violation of regulation or procedure.'" *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) (internal quotations omitted).

On the first ground, "the courts have recognized that contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations and internal quotations omitted). Thus, the Court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, . . . and the disappointed bidder bears a heavy burden of showing that the award decision had no

rational basis." *Id*. at 1332–33 (citations and internal quotations omitted).  On the second ground, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id*. at 1333 (citation and internal quotation omitted).

Bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to RCFC 52.1.  RCFC 52.1 requires that the Court "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005).  "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record." *Id*. at 1355-56.  Therefore, in reviewing cross-motions for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Jordan Pond Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014).

However, before the Court can proceed to the merits of a bid protest, a protestor must establish that it has standing.  *Castle v. United States*, 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("Standing is a threshold jurisdictional issue, which . . . may be decided without addressing the merits of a determination."); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing].").  As standing is a jurisdictional issue, it may be raised in a motion to dismiss under RCFC 12(b)(1).  In considering a motion to dismiss for lack of subject matter jurisdiction, the Court must accept a plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences in the light most favorable to that party.  *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1347 (Fed. Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  If a challenge is raised to subject matter jurisdiction, the plaintiff has the burden of proving that the Court has jurisdiction by a preponderance of the evidence.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

Moreover, not only must the Court have jurisdiction over a plaintiff's claim, but the claim must also be one upon which relief can be granted.  To defeat a motion to dismiss pursuant to RCFC 12(b)(6), and as further explained below, a plaintiff must "establish that the complaint 'adequately states a claim,' that is, that the complaint 'contain[s] either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory.'" *Ins. Co. of W. v. United States*, 83 Fed. Cl. 535, 537–38 (2008) (alteration in original) (quoting *Twombly*, 550 U.S. at 562); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .") (citations omitted).

## B.   Analysis

### 1.   Plaintiff Has Failed to Establish Standing

"It is well-established that the plaintiff bears the burden of establishing the court's jurisdiction by a preponderance of the evidence. *Brandt v. United States,* 710 F.3d 1369, 1373 (Fed. Cir. 2013).  In bid protests,"[o]nly an 'interested party' has standing to challenge a contract

award." *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (citing *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006); 28 U.S.C. § 1491(b). This means that in bid protests, standing "is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States,* 258 F.3d 1294, 1302 (Fed. Cir. 2001). Accordingly, Plaintiff must prove two elements to establish it has standing: (1) that it is an actual or prospective bidder/offeror, and (2) that it possesses a direct economic interest in the award of the contract. *CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015).

Generally, in the post-award bid protest context, the "direct economic interest" prong of the standing inquiry requires a plaintiff to "show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (citation omitted); *see also Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("A party has been prejudiced when it can show that but for the error, it would have had a substantial chance of securing the contract.") (citations omitted). The Federal Circuit has instructed that the test is effectively the same when an agency sole source awards a contract. In *Emery Worldwide Airlines, Inc. v. United States*, the circuit held:

> When a party contends that the procurement procedure in a sole-source case involved a violation of a statute, regulation, or procedure, it must establish prejudice by showing that it would have had a substantial chance of receiving the award, *see Statistica,* 102 F.3d at 1582. A disappointed party can establish prejudice either by showing: (1) proceeding without the violation would have made the procurement official's decision to make a sole-source award rather than to conduct a competitive bidding process irrational, *see* 5 U.S.C. § 706; *Bowman,* 419 U.S. at 281, 95 S.Ct. 438, and in a competitive bidding process, the complaining party would have a substantial chance of receiving the award, *see Alfa Laval,* 175 F.3d at 1367; or (2) proceeding without the violation, the complaining party would have a substantial chance of receiving the sole-source award, *see id.*

264 F.3d 1071, 1086 (Fed. Cir. 2001).

The posture of the instant action, however, is somewhat unique. First, it is pre-award, which this Court and the Federal Circuit have found requires certain adjustments to the standing inquiry, related to how prejudice is demonstrated. To demonstrate prejudice in pre-award protests, it is a plaintiff's burden to "show 'a non-trivial competitive injury which can be addressed by judicial relief.'" *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012) (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009). Second, Plaintiff is not challenging the sole source award of the instant solicitation, nor the ability to re-compete for the contract, but rather, is effectively challenging the *absence* of an entirely different contract drafted to its preferences and separately competed. But whether the Court applies a "substantial chance" test, a "non-trivial competitive injury" test, or some other variation of prejudice, it is clear Plaintiff has not demonstrated that it has been prejudiced.

The Court begins in the most obvious place: the F414 PBL that is the very subject of this pre-award bid protest. With relative ease, the Court finds that Plaintiff does not have standing to challenge the F414 PBL, or alleged errors in the procurement thereof, as Plaintiff itself repeatedly concedes that (1) it is not approved to perform express requirements of the contract, and (2) it is not even interested in the F414 PBL at all—rather, just *one* aspect of the 778 components included therein.[12] *See* Pl.'s MJAR at 16 ("*We concede* that BH is not presently an approved 'repair' vendor . . . . We want to exclude the replacement/spares from the PBL. The government can keep 'repair' in the PBL.") (emphasis added); Compl. ¶ 51 ("*We concede* that BH is not presently an approved 'repair' vendor . . . .") (emphasis added).

Accordingly, Plaintiff does not even meet the first prong of the standing inquiry, as it is neither an actual nor prospective bidder for the instant F414 PBL contract. Furthermore, Plaintiff would neither stand a "substantial chance" of receiving the award absent *any* agency error nor face a "non-trivial competitive injury" by the contract's sole source award to Defendant-Intervenor. Thus, Plaintiff could not meet the second (or, prejudice) prong of the standing inquiry. Stated differently, Plaintiff is not—by its own admission—in a position to compete for the F414 PBL, and, therefore, it cannot be said that Plaintiff meets any applicable standard for prejudice or injury in not being awarded the contract.

Next, and in effectively the same fashion, the Court considers whether Plaintiff would have standing to challenge a contract consisting *solely of the line item* associated with the subject afterburner liner, PN 5103T24G04. For the very same reasons as with the overall F414 PBL itself, Plaintiff has both conceded its lack of "repair" approval, not addressed its ability related to "overhaul," and articulated an overall lack of interest in requirements within the line item as currently formulated. *See* Compl. ¶ 52 ("We want to exclude the replacement/spares from the PBL. The government can keep 'repair' in their PBL.").

Plaintiff, in fact, offers no evidence that it can even "replace" or manufacture an F414 afterburner liner. Rather, Plaintiff argues that it is source-approved for the F414 afterburner liner and that it has a contract that it has yet to fulfill for four afterburner liners for the F414 engine. But the solicitation, even if broken down to just the afterburner liner component, does not call for the supply or manufacture of spare afterburner liners. Rather, it is for the repair, overhaul, and replacement of those liners at the depot level at the Fleet Readiness Center South East ("FRCSE") in Jacksonville, Florida. AR 134. Simply having a supply of spare afterburner liners does not meet the Navy's requirements. *See id.* ("The Contractor shall enter into Public Private Partnership (PPP) for the [FRCSE] in Jacksonville, FL, as required, via a Commercial Service Agreement (CSA) pursuant to [10 U.S.C. § 2474] and maintain Navy 'core repair capability' pursuant to [10 U.S.C § 2464] or other appropriate authority. Since the capabilities are already established at the organic depot/Government facility, the Contractor shall transition workload to that organic depot/Government facility. The Contractor shall maintain commercial support as required to meet contract requirements."). In fact, examining the solicitation carefully, it appears that it is really the prospective awardee, not the government, that may need a supply of spare

---

[12] Plaintiff by its own admission is not approved for the repair of PN 5103T24G04, nor has it claimed any ability to "overhaul" the component—and of course, *there are 777 other components* of the F414 PBL that Plaintiff has shown no interest in whatsoever.

afterburner liners sufficient to conduct the necessary "replacement" at the FRCSE, and the prospective awardee "will procure parts or services, including unique consumable items to support this requirement in accordance with the *Contractor's* standard supplier, purchasing and quality systems." AR 135 (emphasis added).

Therefore, Plaintiff is neither an actual or prospective bidder for a contract specific to the subject afterburner liner contract line item, nor has Plaintiff demonstrated a "substantial chance" of being awarded such a contract. Similarly, Plaintiff has not alleged a "non-trivial competitive injury" in not being awarded such a contract.

Finally, the Court considers what Plaintiff truly came here for: "the unbundling of the procurement," and, in the alternative, "to exclude repair/replacement services for P/N 5103T24G01 which should have been excluded from the Protested Solicitation." Compl. at 23; Pl.'s MJAR at 37. As the Court cannot order the "unbundling" of an already not-bundled procurement, *see* subsection B.2 *infra*, and as Plaintiff admits it is not approved for "repair," and does not even address whether it has the capability to "overhaul" an F414 afterburner liner, the Court interprets Plaintiff's true request as wanting a separate and independently competed contract for the manufacture of the subject F414 afterburner liners. On this *hypothetical* subset—or, more accurately, a subset of a subset of a subset—of the instant procurement, Plaintiff may come closer to the mark of demonstrating standing but still falls short.

The Federal Circuit's understanding of "qualified bidders" is instructive here. In *CliniComp Int'l, Inc. v. United States*, the circuit reaffirmed that in the context of challenges to sole source procurements, "[a]lthough [the plaintiff] need not show that it would have received the award in competition with other hypothetical bidders, it must show that it would have been a qualified bidder." 904 F.3d 1353, 1358 (Fed. Cir. 2018) *(*quoting *Myers Investigative and Security Services, Inc. v. United States*, 275 F.3d 1366*,* 1370–71 (Fed. Cir. 2002)). The *CliniComp* court further stated:

> The Claims Court in *Myers* found no prejudice because the plaintiff had "not proven it had the sources or the man-power to supply the . . . services sought by [the sole-source contracts]" and had "not provided the court with any evidence demonstrating that it ha[d] been awarded or successfully performed contracts for similar services in the past." We accordingly held that the plaintiff in that case lacked standing to bring its bid protest.

*Id*. (internal citations omitted).

In alleging its status as an interested party for a manufacture-only contract,[13] Plaintiff relies entirely on two points: "BH is both source approved for the subject afterburner liner NSN 2840-01-480-8247 ('Subject Afterburner Liner') and has been awarded a contract SPRPA1-19-Q-Z282 for its production." Pl.'s Resp. & Reply at 2 (emphasis in original); *see also id*. at 9 ("BH is source approved for this item and awarded a contract.") (emphasis removed). Taking

---

[13] The Court is rather generous in saying that Plaintiff ever alleged it was an interested party. In fact, in responding to the pending motions to dismiss pursuant to RCFC 12(b)(1), Plaintiff does not use the terms "standing," "qualified," "prejudice," or "interested party" once. *See generally* Pl.'s Resp. & Reply.

these in turn, it is not disputed that Plaintiff received a letter regarding its approval to manufacture the F414 afterburner liner.  *See* AR 285 ("B.H. Aircraft Co, Inc is qualified to manufacture the F-414 Liner based on strong similarity [to the F-404 afterburner liner].").  Approval alone, however—and, more accurately in this case, conditional approval—does not equate to standing.  If such were the test, any approved source could challenge a procurement without "demonstrate[ing] a capability even approaching what would be required *under a contract of this size and scope* . . . ."  *CliniComp Int'l, Inc.*, 904 F.3d at 1359 (emphasis added).  To be sure, in a contract such as the instant procurement, a lack of approval would effectively by default render a protester *not* an interested party.  *See* AR 41 (F414 PBL synopsis stating that "Prospective offerors must submit a source approval request to NAVSUP WSS to become an approved Navy source of supply.").  But approval, without more, does not operate the way Plaintiff suggests.

Further, in contrast to the protester in *Myers*, Plaintiff to its credit *has* "provided the court with . . . evidence demonstrating that it has been awarded . . . contracts for similar services in the past," 275 F.3d at 1371, pointing to its 2019 DLA Foreign Military Sales contract for the manufacture of four F414 afterburner liners, *see* AR 288–89.  Yet, Plaintiff does not contest that—as the government points out, *see* Gov.'s MTD & MJAR at 11—it has yet to fulfill the manufacture of even one of the four F414 afterburner liners required by the contract over two-and-a-half years following its award.  In fact, Plaintiff is well over a year past the original due date for providing the four F414 afterburner liners called for in the contract.  *See, e.g.*, AR 1549 (describing in a December 9, 2020, DLA email to Kearns the first "Subclin" in Plaintiff's contract as "delinquent"); AR 1556 (describing in a June 30, 2021, DLA internal email Plaintiff's contract as "delinquent"); AR 1558 (describing in an August 10, 2021, DLA email to Kearns Plaintiff's contract as "delinquent").  What is more, the evidence Plaintiff submitted to the Court in support of its ability to manufacture the F414 afterburner liner calls into question not only Plaintiff's capability to manufacture the liner but whether it even understands how to make the liner in question in the first place.[14]

Additionally, per the Navy's acquisition plan for the instant procurement, "[t]he Navy's current budgeted inventory of F414 engines is ███ with projected increases to ███ engines by fiscal year 2025."  AR 107.  Plaintiff bears the burden of establishing standing by a preponderance of the evidence, but "[a]ll that the evidence now before the Court shows is that BH has been given an opportunity and, in over two years, has failed to deliver *a single unit*."  Gov.'s MTD & MJAR at 12–13 (emphasis added).  Considering the sheer size and scope of a hypothetical contract for *merely the manufacture of* F414 afterburner liners, and the requisite turnaround time for such liners, Plaintiff fails to sufficiently show "that it would have been a qualified bidder."  *CliniComp Int'l, Inc.*, 904 F.3d at 1358.  Thus, it can neither be said that

---

[14] One of Plaintiff's own exhibits—a November 2021 email from Plaintiff to the Defense Contract Management Agency—offered apparently in support of Plaintiff's contention that "BH is performing pursuant to the [DLA contract]," Pl.'s Resp. & Reply at 5, calls into question whether Plaintiff even fully understands how to manufacture the F414 afterburner liner.  The email includes "a PDF outline identifying a few drawing clarifications needed for the F414 Afterburner liner," as part of Plaintiff's effort "to eliminate any possible misunderstanding of the print or GE's Intent [sic] . . . ."  ECF No. 33-2 at 1; *see also id.* ("*Unlike the F404 A/B Liner prints* . . . which clearly mark the center axis -AP- on the drawing views this print indicates only the horizontal axis . . . .") (emphasis added).

Plaintiff stood a "substantial chance" of winning such a hypothetical contract, nor would it suffer a "non-trivial competitive injury" that could be addressed by judicial relief.

In sum, no matter how the Court slices the PBL requirement to Plaintiff's wishes, Plaintiff has not met its burden to demonstrate by a preponderance of the evidence that it was prejudiced. Thus, Plaintiff is not an interested party. Accordingly, as the GAO also determined with regard to the protest brought before it, Plaintiff does not have standing to bring its pre-award bid protest.

## 2.  Failure to State a Claim Upon Which Relief Could Be Granted

Even if the Court were to assume that Plaintiff had established standing to bring the instant protest, Plaintiff nonetheless fails to state a claim upon which relief can be granted. In considering a motion to dismiss for failure to state a claim, dismissal of the complaint "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). The Court must accept as true Plaintiff's well-pleaded factual allegations, *Ashcroft*, 556 U.S. at 679, and draw all reasonable inferences in favor of the non-moving party. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). The Court, however, "is not obligated to accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Sandwich Isles Commc'ns, Inc. v. United States*, 145 Fed. Cl. 566, 573 (2019) (internal quotations and citation omitted), *aff'd*, 992 F.3d 1355 (Fed. Cir. 2021).

Turning to the instant protest, Plaintiff's complaint—even with its factual allegations accepted as true—falls irredeemably short of stating a claim upon which relief can be granted. Plaintiff's pre-award challenge of the instant solicitation rests almost entirely on the grounds that the F414 PBL is a bundled solicitation, and in so bundling the solicitation the Navy allegedly committed prejudicial errors.[15] *See, e.g.*, Compl. ¶ 6 ("Part 5103T24G01 for which BH is qualified for replacement/spares is included in the bundled solicitation."); *id*. ¶ 20 ("Inconsistent with the F404 and despite having an approved competitor for the F414 afterburner liner manufacture, the Navy issued the protested solicitation which includes the afterburner liner within a bundled PBL."); *id*. ¶ 21 ("Issuing the present noncompetitive PBL that includes services that can be competitively established is not only careless and indolent but is an arbitrary & capricious error, . . . because the Agency has not done the required analysis under the statutes and regulations in *improperly bundling the contract*[.]") (emphasis added). Plaintiff, however, fails to factually allege—and the record does not support—that the instant procurement is a bundled contract.[16] Accordingly, as further explained below, Plaintiff's allegations that the

---

[15] The only other claim Plaintiff asserted in its complaint was a claim related to alleged government bias towards Defendant-Intervenor. ECF No. 1 at 23 ("Fourth Cause of Action"). This claim was entirely unsupported by any factual allegations and was not pursued by Plaintiff in its motion for judgment on the administrative record, its response and reply, or at oral argument. The Court treats this factually unsupported and unargued claim as abandoned.

[16] In fact, Plaintiff actually failed even to make a valid legal allegation (at least in terms of existing law) that the instant procurement contained bundling. That is to say, Plaintiff's legal allegations on bundling are based on a section of the FAR that no longer exists after a 2016 re-write. *See* 81 FR 67770-72 (Sept. 13, 2016); *see also* ECF No. 35 at 8 ("In fact, BH appears to have been citing to bundling regulations that were in effect in 2005 . . . .").

instant procurement constitutes bundling or that the Navy failed to conduct bundling-specific analyses do not state a claim upon which the Court can grant relief.

First, it is necessary to understand what contract bundling is and, relatedly, the requirements imposed on the government when it intends to bundle separate smaller contracts into one procurement.  According to the FAR, "bundling"

> (1) Means a subset of consolidation that *combines two or more requirements for supplies or services, previously provided or performed under separate smaller contracts* (see paragraph (2) of this definition), into a solicitation for a single contract, a multiple-award contract, or a task or delivery order that is likely to be unsuitable for award to a small business concern (even if it is suitable for award to a small business with a Small Business Teaming Arrangement) due to—
>> (i) The diversity, size, or specialized nature of the elements of the performance specified;
>> (ii) The aggregate dollar value of the anticipated award;
>> (iii) The geographical dispersion of the contract performance sites; or
>> (iv) Any combination of the factors described in paragraphs (1)(i), (ii), and (iii) of this definition.
> (2) "Separate smaller contract" as used in this definition, means a contract that has been performed by one or more small business concerns or that was suitable for award to one or more small business concerns.

FAR 2.101 (emphasis added); *see also Che Consulting, Inc. v. United States*, 125 Fed. Cl. 234, 245 (2016) ("Case law that interprets the pertinent statutes and regulations makes it clear that 'to constitute bundling, a solicitation must: (1) consolidate two or more requirements that were previously procured under separate smaller contracts into a single contract, and (2) likely be unsuitable for award to a small business.'") (quoting *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 739 (2007)).

The FAR imposes certain prerequisites on an agency before it can bundle, which state in relevant part:

---

In lodging its allegation that the Navy "failed to comply with FAR 7.107," Plaintiff quotes at length—and rests its allegations upon—an outdated version of the FAR that has long-since been almost entirely rewritten.  *Compare* Compl. ¶ 97 *with* FAR 7.107-3 and FAR 7.107-4; *see also* Compl. ¶ 116 (Plaintiff's "Third Cause of Action," alleging that "[t]he bundling violated *FAR 7.07(e)*," which is both an apparent typo and an attempted reference to an outdated FAR section) (emphasis added).  While the Court grants that requirements in the current version of the FAR are somewhat similar, it is striking that Plaintiff would base its entire grounds for relief on the government's alleged violation of a FAR section and verbiage that no longer exists.  The FAR's previous bundling section, however, is sufficiently similar to current FAR 7.107-3 and 7.107-4 that the Court believes the government and Defendant-Intervenor were put on adequate notice of the nature of Plaintiff's claims to allow the Court to at least address the merits of the claims on a motion under RCFC 12(b)(6) despite Plaintiff's reliance on a FAR section that is no longer in existence.

Bundling may provide substantial benefits to the Government.  However, because of the potential impact on small business participation, *before conducting an acquisition strategy that involves bundling, the agency shall make a written determination that the bundling is necessary and justified* in accordance with 15 U.S.C. 644(e).  A bundled requirement is considered necessary and justified if the agency would obtain measurably substantial benefits as compared to meeting its agency's requirements through separate smaller contracts or orders.

FAR 7.107-3(a) (emphasis added).[17]  Moreover, "[t]he agency shall quantify the specific benefits identified through the use of market research and other techniques to explain how their impact would be measurably substantial . . . ."  FAR 7.107-3(b).  Additional analysis and documentation requirements are also imposed "when the proposed acquisition strategy involves substantial bundling," such as when a contract with the Department of Defense has an estimated value of $8 million or more.  *See* FAR 7.107-4.

Plaintiff contends that in carrying out "[t]he impending bundling," Compl. ¶ 93, "[t]he Navy has simply failed to comply with FAR 7.107 Additional Requirements For Acquisitions Involving Bundling," Compl. ¶ 97. Moreover, Plaintiff asserts the government violated "7.107" because "the potential 'substantial benefits' were lost when limiting the solicitation to one bidder when BH was already and has a history of already providing cheaper units costs.  Furthermore, . . . there is no proof that any of the required analysis and comparisons were ever done or done as required."  Pl.'s MJAR at 28.  Thus, to state the obvious, for Plaintiff's allegations of agency error in the *bundling process* to survive a motion under RCFC 12(b)(6), Plaintiff must sufficiently show that the instant procurement is, in fact, bundled.  Plaintiff, instead, quickly makes the inferential leap that the procurement is bundled and moves on to its legal argument without even alleging (much less identifying) the existence of a "separate smaller contract."

The Court observes that Plaintiff's very *first* factual allegation to support its claim that the instant PBL actually includes a separate smaller contract that was bundled does not appear until its final brief in this matter.  In its prior filings, including most importantly its complaint, Plaintiff simply refers to the instant PBL as "bundled" without anything more to support that allegation.  On this pleading deficiency alone, Plaintiff's complaint fails to state a claim under RCFC 12(b)(6), as it fails to set forth any facts to support its legal conclusion that the instant PBL requirement is bundled.  *Sandwich Isles Commc'ns, Inc*, 145 Fed. Cl. at 573 (noting a court "is not obligated to accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of factual allegations.") (internal quotations and citation omitted).  That is to say, Plaintiff fails to allege in its complaint exactly which separate smaller contract was bundled into the procurement at issue in this protest.  As is explained more fully below, absent any evidence of a separate smaller contract that is being bundled into the instant procurement, there simply cannot be "bundling" in the first place and Plaintiff's claim must fail as a matter of law.

---

[17] Because the Court ultimately finds that the instant contract is not bundled, the Court does not take time here to provide more detailed insight into what specifically is required of agencies when a contract is, in fact, bundled.

Once Plaintiff finally alleges—belatedly— in its reply brief the bundling of a previous separate smaller contract, it insists that the first indicator of a bundled contract—a procurement that "combines two or more requirements for supplies or services, previously provided or performed under separate smaller contracts"—is met because "[p]rior to the Issuance [sic] of the first F414 PBL, solicitations for the afterburner liner of issue were issued as smaller stand alone contract for spares suitable for award to an approved small business (Ref N0038303QM466 Dated Oct 2003)." Pl.'s Resp. & Reply at 9. This assertion is wrong for at least two reasons.

First, to the extent Plaintiff alleges that the 2003 contract was *the* previously performed contract being bundled by the Navy, the alleged bundling of that smaller contract would have taken place once the contract "[d]ated Oct 2003" (or the requirements therefrom) was first incorporated into an F414 PBL. As the record reflects, the instant procurement constitutes the sixth iteration (or fifth follow-on) of the F414 PBL. A plain reading of the relevant sections of the FAR makes clear that any challenges to an alleged bundling error must happen when the bundling *of that smaller contract* actually occurs.

For example, FAR 7.107-3 provides that "*before* conducting an acquisition strategy *that involves bundling*, the agency shall make a written determination that the bundling is necessary and justified . . . ." FAR 7.107-3(a) (emphasis added). If, as Plaintiff alleges, the 2003 contract for F414 afterburner liners was indeed at one time bundled into the F414 PBL, that bundling occurred several PBL iterations ago. In other words, the instant solicitation does not "involve[] bundling" of *that* contract. Plaintiff has not pointed the Court to any case or authority suggesting that an agency soliciting bids for *successive* iterations of a previously-bundled contract must *each and every time* "quantify the specific benefits [of bundling] identified through the use of market research and other techniques . . . ." FAR 7.107-3(b).

Plaintiff's interpretation could lead to rather absurd results. Under Plaintiff's interpretation, an agency would be required to conduct a full bundling analysis of *each* line item, portion, or permutation of an acquisition strategy that at *any* time in history was separately solicited as a separate smaller contract suitable for award to small businesses. The Court can imagine a scenario in which one line item—say, fasteners—was part of *numerous* separate smaller contracts that were bundled together decades ago and procured through a single procurement. Under Plaintiff's suggested interpretation of the FAR, every time an agency needed to reprocure those fasteners it would also need to "quantify the specific benefits identified through the use of market research and other techniques" for *each formulation* of the previously bundled smaller contracts that—either alone or in collection with—contained the relevant fasteners. Where is the line drawn? Plaintiff provides no limiting principle. Nonetheless, this question is not even necessary to the outcome of this case, as Plaintiff has not *factually* alleged that a bundling ever actually took place with respect to the F414 PBL. It simply calls the PBL "bundled," notes a 2003 contract, and asks this Court to "order the unbundling of the procurement" in its favor. Pl.'s MJAR at 37.

More importantly, *the instant procurement is at issue*, not the Navy's decision many years ago to allegedly bundle requirements into a PBL contract. Plaintiff fails to cite a single case that indicates a long-since-passed bundling decision may be properly challenged in a subsequent solicitation. Rather, the Court finds instructive GAO's analysis in *Bluestar Energy*

*Solutions*, wherein it concluded that a General Services Administration procurement did not constitute bundling, as "the seven accounts in the current solicitation have been included in a single contract requirement since electric deregulation began . . . 7 to 8 years ago" and thus "GSA has not consolidated separate smaller contracts into a single contract" for the solicitation at issue. *Bluestar Energy Sols.*, B-405690, 2011 WL 6161267, at *2 (Comp. Gen. Dec. 12, 2011). Plaintiff makes no allegation of a separate smaller contract for F414 afterburner liners that is being bundled into the *instant* solicitation. It simply asserts that the PBL is bundled and that, at least in 2003, the afterburner liners were separately competed. This is not factual evidence of bundling.[18]

Nor does Plaintiff sufficiently allege that contracts for F414 afterburner liners were *ever* "performed by one or more small business concerns or [were] suitable for award to one or more small business concerns" and, thereafter, bundled into a larger contract. *See* FAR 2.101; *see also* Gov.'s Resp. & Reply at 4 ("BH references a 2003 contract predating the Navy's adoption of its PBL acquisition strategy. BH does not seek to supplement the administrative record with those historical contracts, and for good reason. Although the Navy's pre-PBL contracts were structured differently, they were still performed exclusively by GE.") (internal citations omitted).

Second, as the government and Defendant-Intervenor correctly point out, if Plaintiff wants to challenge any alleged bundling or bundling violations in connection to the 2003 contract, such claims would be well beyond the relevant statute of limitations. *See* ECF No. 35 at 4–5 ("The Solicitation at issue in BH's protest was issued in 2021, and BH cannot use its protest of the 2021 Solicitation as a vehicle to challenge a separate decision the Navy made in 2003. Moreover, BH's challenge to the Navy's decision in 2003 to use a PBL contract is barred under the applicable six-year statute of limitations."); Gov.'s Resp. & Reply at 4 ("[T]o the extent BH is challenging the Navy's adoption of a PBL acquisition strategy in approximately 2004, *see* AR822, such a challenge is both untimely and barred by this Court's six-year statute of limitations.") (citing 28 U.S.C. § 2501).

Perhaps recognizing the timeliness hurdle in relying on the 2003 F414 requirement as its sole evidence of a "separate smaller contract," Plaintiff at oral argument seemed to suggest for the first time that its incumbent 2019 DLA contract for F414 liners satisfies the FAR definition, and, therefore, the instant solicitation is bundled. Not so. Plaintiff's 2019 DLA contract has no effect, with regard to bundling, on the instant solicitation. The requirements of that contract— the manufacture of four F414 afterburner liners procured for Foreign Military Sales—is not contemplated by the instant solicitation at all, which solicits "the repair/overhaul/replacement of [PN 5103T24G04] in accordance with the applicable provisions of this contract" for the Navy's entire F414 engine fleet. AR 134. In other words, the instant solicitation is not "combin[ing] two or more requirements for supplies or services, previously provided or performed under separate smaller contracts" into one solicitation, FAR 2.101 (emphasis added), as the "repair/overhaul/replacement" of the subject afterburner liner for the Navy's F414 engine fleet

---

[18] Because the 2003 contract bundling allegation was not made in the complaint, it is not a factual assertion that must be accepted as true for purposes of a RCFC 12(b)(6) motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, *a complaint* must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting *Twombly*, 550 U.S. at 570) (emphasis added).

was not—immediately prior to the instant solicitation—performed under a separate smaller contract.

It is equally telling that, in arguing the Navy violated the FAR's bundling regulations, Plaintiff makes no allegation in its complaint (or its motion for judgment on the administrative record) that the agency violated FAR 7.107-5(a), which concerns "Notifications to current small business contractors of agency's intent to bundle." Per this regulation, "[t]he contracting officer shall notify each small business *performing a contract that it intends to bundle the requirement* at least 30 days prior to the issuance of the solicitation for the bundled requirement." FAR 7.107-5(a)(1) (emphasis added). Plaintiff, of course, could not so allege because there are currently no small businesses performing a contract of which the Navy intends to bundle into the instant F414 PBL—or, at the very least, there are no such incumbent small businesses performing such contracts that have made their objections known in this matter.

Plaintiff simply has not shown—or even properly alleged[19]—that two or more separate smaller contracts have been bundled together to form the current solicitation. It may be true that at one time, the requirements reflected in this solicitation were competed as separate contracts. In fact, the Court could imagine many of the parts or components at one time being separately competed. But Plaintiff has shown no previous contract for F414 afterburner liners *that is now being bundled into the instant contract*, such that an incumbent small business performing those requirements might now stand to lose out on the ability to compete for what they currently provide. *See, e.g.*, AR 116 ("This proposed contract does not constitute bundling as no small businesses have performed contracts for any of the items covered by this acquisition."). It follows, then, that Plaintiff's assertion that the Navy violated the *bundling* regulations—by failing to both recognize Plaintiff as an alternative source and, in turn, conduct bundling-specific market research and analyses—does not state a claim upon which the Court can grant relief. In other words, even entirely accepting Plaintiff's allegation as true that "the Agency made an unfortunate oversight [in] mistakenly failing to see BH's name on the ITIMP database," Compl. ¶ 10, such oversight is of no consequence whatsoever, because the Navy was not required to conduct a bundling analysis.

To summarize, the allegations in Plaintiff's first, second, third, and fifth causes of action are based on the premise that the subject PBL contract constitutes a "bundled" requirement. However, Plaintiff's complaint does not identify any "separate smaller contracts" that are being bundled into this PBL contract. Indeed, it appears that no such separate smaller contracts exist— at least so far as the Court has been made aware and so far as Plaintiff alleged in its complaint. The complaint itself, in fact, acknowledges that PN 5103T24G04 has been acquired under the incumbent PBL contract, which reinforces that PN 5103T24G04 is not "bundled" with the forthcoming PBL contract.[20] *See* Compl. ¶¶ 37–39. Because the Navy is not combining "two or

---

[19] *See supra* note 9.

[20] The Court must stress the near absurdity of the situation presented by the instant case. It is undisputed that the Navy has issued successive FS PBL contracts for the F414 engine fleet since at least 2008. *See* AR Tab 36 (F414 FS PBL N00383-08-D-002M (2/1/2008 to 6/30/2011)). It is also undisputed that Defendant-Intervenor has been the sole source awardee of each. Now, some fourteen years later, Plaintiff—which, to be sure, has a history of manufacturing the *F404* afterburner liner, which is not at issue in this protest—is asking the Court to "order the unbundling of the procurement" or "exclude repair/replacement services" for the *F414* afterburner liner, Compl. ¶¶ 1, 2, because "the inclusion of this component in the planned action will foreclose [Plaintiff's] access to vital

more requirements for supplies or services, previously provided or performed under separate smaller contracts . . . , into a solicitation for a single contract," and because Plaintiff has otherwise failed to offer any allegations that if true would demonstrate that the bundling requirements apply to the PBL contract at issue, there is no basis to conclude that the Navy's failure to comply with the cited bundling requirements states a claim upon which relief can be granted to Plaintiff.[21]

## CONCLUSION

For the reasons set forth above, Plaintiff has not established standing to bring this bid protest.  Moreover, even had Plaintiff been able to meet its burden to establish standing, it nonetheless fails to state a claim upon which relief can be granted.  Accordingly, the Court **GRANTS** the motions to dismiss pursuant to RCFC 12(b)(1) and Defendant-Intervenor's motion to dismiss pursuant to RCFC 12(b)(6).  Plaintiff's complaint is hereby **DISMISSED**, and the Clerk shall enter judgment accordingly.

The parties shall confer to determine agreed-to proposed redactions to this opinion.  On or before **March 31, 2022**, the parties shall file a joint status report indicating their agreement on proposed redactions, attaching a copy of those pages of the Court's opinion that contain proposed redactions, with all proposed redactions clearly indicated.

**IT IS SO ORDERED**.


s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge

---

replacement business for older aircraft engines that are beginning to be retired," Compl. ¶ 28.  It is not the government's duty, much less the Court's, to ensure "BHs [sic] company's access to vital replacement business for older aircraft engines that are beginning to be retired."  Compl. ¶ 28; *see also id.* ¶ 30 ("A new PBL will lock BH out of business through 2027 that BH has depended on for 30 years.").

[21] Plaintiff's complaint is akin to a party alleging a breach of contract yet failing to allege that the contract at issue ever existed whereupon such a breach could even occur.  Even accepting all of Plaintiff's factual allegations as true—the mistakes by the Navy in overlooking Plaintiff as an approved alternate source for manufacture, and the Navy's failure to conduct bundling-specific research and analysis—it still does not add up to a claim upon which this Court can grant relief to Plaintiff.  *Lindsay*, 295 F.3d at 1257 (noting dismissal of the complaint "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy.").  Accordingly, the Court is compelled to dismiss Plaintiff's complaint in its entirety.